**J. E. BERNARD & CO., Inc., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**C.D. 3750;  Protest 64/1197–13784.**

United States Customs Court,
Second Division.
March 26, 1969.

Schwartz & Lidstrom, Chicago, Ill. (Earl R. Lidstrom and Joseph Schwartz, Chicago, II, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Morris Braverman and Irving A. Mandel, New York City, trial attorneys), for defendant.

Before RAO, FORD, and ROSEN-STEIN, Judges.

ROSENSTEIN, Judge:

The merchandise in this case, which is invoiced as "Contaminated Bismuth Scrap in pieces for remelting and refining purposes only", was imported from Canada in 1960 for the account of United Refining & Smelting Co. It was classified as bismuth under paragraph 377, Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, and assessed with

duty thereunder at the rate of 1⅞ per centum ad valorem. Plaintiff claims that this shipment is entitled to entry free of duty as metal scrap or, alternatively, as articles imported to be used in remanufacture by melting, under the provisions of sections 1 and 2, respectively, of Public Law 81–869, 64 Stat. 1093, as amended by Public Law 86–606, 74 Stat. 361. The pertinent parts thereof are as follows:

Sec. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap", as used in this Act, shall mean all ferrous and nonferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

Sec. 2. Articles of which metal is the component material of chief value, other than ores or concentrates or crude metal, imported to be used in remanufacture by melting, shall be accorded entry free of duty and import tax, upon submission of proof, under such regulations and within such time as the Secretary of the Treasury may prescribe, that they have been used in remanufacture by melting: *Provided, however*, That nothing contained in the provisions of this section shall be construed to limit or restrict the exemption granted by section 1 of this Act.

The testimony of two witnesses and the papers forwarded by the collector to the court make up the record herein.

Benjamin Sims, president of United Refining & Smelting Co., testified that he purchased the subject merchandise from Metal and Ore Company Ltd., Canada. He had ordered scrap bismuth for remelting and refining purposes only and received pieces of broken bismuth ingots packed in old drums. He melted the imported material and, by adding activated gases and compounds at temperature levels higher than the melting point of bismuth, removed the silver, lead and copper impurities therein which were not retained.

According to the witness, pure bismuth is a white metal with purplish tint, large crystals and a smooth surface. The importation had a grayish appearance with small crystals and impurities on the top which gave it a rough surface. Sims, who has been refining bismuth for about ten years, stated that the metal is used in pharmaceuticals, such as Pepto Bismol, which require a high purity bismuth, and in low melting point alloys used to make fixtures, dies, and patterns. He purchased the merchandise on the basis of an analysis received in advance of shipment.

On cross-examination, he testified, with respect to the involved shipment, that the " * * * scrap metal apparently originally was melted into ingots, into a homogeneous metal and [sic] in order for them to come up with a uniform representative sample of the entire lot and assay it." The ingots could have come from different types of scrap material. However, he never saw the original material or the ingots from which the imported pieces were obtained. The importation contained approximately 96½ percent pure bismuth of which one percent was lost with the dross. It was refined to 99.99 percent plus purity and cast into ingots weighing 40 to 50 pounds. He was not certain whether it was sold to a pharmaceutical house.

Although the witness is neither a chemist nor metallurgist, he averred that "Any metal man * * *" could look at the broken ingots and tell that they were contaminated. Bismuth used in low melting point alloys must be over 99.95 percent pure. The bismuth requested of his company is always specified as 99.95 percent pure or better. He

was not certain whether there are uses for bismuth under that percentage: it depends on what one wants to use it for. He prefers to sell impure bismuth but, except for another refiner, has not found a market for it (" * * * they want it for a lot less money * * * ").

Henry A. Knudsen, plant foreman and manager of United Refining & Smelting Co. for 12 years, who is in charge of processing the material at the plant, testified that the involved shipment consisted of broken pieces, some of which were loaded with dross. They were dark gray in color with small light crystals. Pure bismuth is brittle and pinkish green with big crystals.[1] After receipt, the material was melted in pots. As it melted, the impurities rose to the top.

On cross-examination, the witness, who admittedly is not a metallurgist or chemist, stated that the imported pieces " * * * must be broken ingots because of the looks of them." They were smooth on the side where the bismuth had been poured into the ingot mold but rough on the top surfaces as a result of the lead, copper and silver contaminants which were present.

Among the papers received in evidence, to which we shall advert, infra, are two affidavits executed on January 31, 1962 by Mr. Knudsen, and two letters, dated September 28, 1960 and November 10, 1960, respectively, signed by Arnold Ross, vice president of the importing refining company herein, and addressed to the collector of customs at the port of Chicago.

■ The burden rests upon plaintiff to rebut the collector's presumptively correct classification and to establish by competent proof that the imported merchandise is properly classifiable under the provisions of Public Law 869. Alloys & Chemicals Co., Inc., Carson M. Simon & Co. v. United States, 54 CCPA 84, C.A.D. 912 (1967).

■ In order to come within the ambit of section 1, a claimant must establish that the involved bismuth is "secondhand or waste or refuse" or "obsolete, defective or damaged" and "fit only to be remanufactured." It is a *sine qua non* of such proof that the source of the shipment at bar be shown or its origin otherwise satisfactorily established.

In the *Alloys & Chemicals Co.* case, *supra,* which involved a claim for free entry of aluminum materials as "scrap" under section 1 of Public Law 869, our appellate court stated (at page 87):

> * * * In our view the applicable law and the facts adduced of record, support the statement of the Customs Court [Id. v. Id., 56 Cust.Ct. 38, C.D. 2609] that:
>
> > Public Law 869, 81st Congress, second session, spells out, in clear unambiguous language, the type of merchandise Congress intended to be granted and [sic] the benefit of free entry as metal scrap. For a claimant to receive its benefits, satisfactory evidence must be presented to show the source of the metal scrap and to establish that, in its condition as imported, *it was only fit to be remanufactured.* Although the witness who testified * * * was a man of wide experience and extensive background in the secondary materials industry, it appears from the record herein that he did not have specific information as to the source from which the * * merchandise was derived, whether, as stated in Public Law 869, *supra,* from ferrous or nonferrous materials or articles which are "secondhand or waste or refuse" or are "obsolete, defective or damaged." His testimony on that important phase of plaintiffs' essential proof is at best vaguely inferential rather than direct and positive. [Emphasis ours.] [Italics quoted.]

1. The discrepant testimony regarding the color of pure Bismuth is noted but deemed irrelevant for the purposes of this opinion.

The court also noted the references in the decision below to the cases of Lando Products, Inc., and W. J. Byrnes & Co., Inc. v. United States, 44 Cust.Ct. 440, Abs. 64128 (1960), and Afram Bros. Company v. United States, 49 Cust.Ct. 53, C.D. 2360 (1962), involving similar issues, wherein this court found, in each instance, that plaintiff had failed to furnish satisfactory evidence as to the source or character of the imported material and to establish that, in its condition as imported, it was fit only to be remanufactured. The court of appeals thereupon concluded (at page 88):

> In the instant case the sole witness upon whose testimony appellants must rely was unable to identify the specific source from which the imported goods emanated in Europe. He stated that he had not seen the imported merchandise and did not know of its whereabouts prior to importation. The imported materials may or may not have been "second-hand or waste or refuse," or "obsolete, defective or damaged" and "fit only to be remanufactured." We are not at liberty to "supply from our imagination what should have been established by competent proof."

■ The deficiencies of proof in the instant record match those noted in the aforesaid cases. This court's statement in *Lando Products, Inc., supra,* that " * * * there is not a scintilla of proof from any qualified witness to show the source of the imported material, * * *" applies equally to the testimony herein. Neither witness saw the bismuth until after importation nor could testify to its origin. It is no more than mere conjecture on Sims' part that the material, which he had purchased solely on the basis of an analysis furnished by the seller, was cast from scrap material.

Plaintiff has also failed to establish that the subject merchandise is fit only to be remanufactured. The testimony of record on this point is vague and unsatisfactory. Sims' statements that his customers require bismuth that is at least 99.95 percent pure and that he doesn't know of any uses for it in a less pure state fall far short of proving that there is no commercial market for bismuth containing less than four percent of contaminants, or that bismuth of this grade has no industrial use in a manufacturing, as distinguished from remanufacturing, process. Furthermore, it is doubtful that the witness, who is not a metallurgist or chemist, possesses a requisite degree of knowledge concerning all the commercial uses of bismuth (" * * * So I am not certain whether there are uses for anything under 99.95. It depends on what you want to use it for.") to testify competently in this area.

The aforementioned letter of Arnold Ross, dated September 28, 1960, states that " * * * the five drums of contaminated Bismuth metal * * * to the best of our knowledge cannot be used for any useful commercial purpose, * * * " and that it " * * * has been purchased by us for refining and purifying purposes only." His letter of November 10, 1960 states that the bismuth " * * * has been fully consumed in our refining furnaces * * * " and " * * * in its original shipped form was of no commercial value and could not be used as such."

Although the letters were received in evidence without objection by defendant, the statements therein are mere conclusions which do not suffice to resolve the question whether the merchandise was scrap fit only to be remanufactured. J. F. Goldkamp & Company, Valley Steel Products Co. v. United States, 61 Cust. Ct. ——, C.D. 3625 (1968); Thornley & Pitt a/c Earl Investment Corpn. v. United States, 33 Cust.Ct. 136, C.D. 1645 (1954), reh. den. 33 Cust.Ct. 447, Abs. 58558 (1954). Plaintiff has not established that removal of the surface impurities and recasting of the imported material were essential to its commercial viability.

The instant record stands in marked contrast to that in the case of Henry

**1039**

Harris & Co. v. United States, 29 Cust. Ct. 331, C.D. 1488 (1952), cited by plaintiff, wherein the testimony of a well qualified witness as to the origin, condition, and total unsuitability of defective steel sheets for any commercial use in their imported state established that they were "scrap" with the meaning of Public Law 869. See also Gallagher & Ascher Company v. United States, 40 Cust.Ct. 499, Abs. 61737 (1958).

Plaintiff has failed to substantiate its claim for free entry of the instant merchandise under section 1 of Public Law 869.

We now consider plaintiff's alternative claim under section 2 of said law which grants free entry to—

> Articles of which metal is the component material of chief value, other than ores or concentrates of crude metal, imported to be used in remanufacture by melting * * * upon submission of proof, under such regulations and within such time as the Secretary of the Treasury may prescribe, that they have been used in remanufacture by melting: * * *.

Our function is to determine the legislative intent incorporated within the language of section 2 to ascertain whether the goods at bar fall within the scope of the exemption provided therein.[2] United Metal Goods Mfg. Company v. United States, 46 CCPA 120, C.A.D. 712 (1959). The history of this provision is set forth in the *United Metal* case, as follows:

> It is perfectly obvious that this statute was enacted as a war and post-war measure in an endeavor to facilitate access to scrap metal and surplus war material by the United States. It was conceived during the Second World War years * * *.

The report of the Ways and Means Committee of the House of Representatives No. 996, July 7, 1949, in referring to section 2 of Public Law 869 states:

> The bill also adds a new section to the act of March 13, 1942, to allow the admission free of duty of certain articles *technically* not included in the definition of scrap contained in section 1(b). The criterion for exemption *from duty is the use of the articles in* question in remanufacture by melting. Entry free of duty and import tax is granted only upon submission of proof, under regulations prescribed by the Secretary of the Treasury, that such articles have been imported for, and have been used in, remanufacture by melting. *The new section added to the act of 1942, therefore, would allow the admission of articles such as surplus war materials which are new, undamaged and not obsolete, if they are imported for, and are used only for, remelting purposes. Since there is a guaranty that such articles are to be used only in remanufacture by melting, they would not compete with domestic industry to any greater extent than would articles that fall within the definition of scrap now in the act of 1942.* (Emphasis added.) [Italics quoted.]

We have already found that, in light of plaintiff's failure to identify the source of the imported material, the record does not satisfactorily establish that it is "scrap" as defined in section 1(b).

Plaintiff, moreover, had to submit proof under such regulations as may have been prescribed by the Secretary of the Treasury that the articles were "used in remanufacture by melting." Compliance with these regulations is mandatory and a condition precedent to obtaining the benefit of free entry under section 2. Socony Vacuum Oil Co., Inc. v. United States, 44 CCPA 83, C.A.D. 641 (1957); MacNichol Packing Co. et al. v. United States, 14 Ct.Cust.App. 400, T.D.

---

2. Plaintiff's contention that, as the imported material was, in fact, "remelted" within the statutory time allowed, it is "entitled" to free entry, is totally without merit. Section 2 is a conditionally free provision and, hence, should be strictly construed. Afram Bros. Company v. United States, supra.

42050 (1927); Afram Bros. Company, *supra*.

The regulations promulgated by the Secretary of the Treasury pursuant to Public Law 869 and in effect at the time of entry herein are set forth in 19 CFR 54.6 (1958).

Section 54.6(a) provides that—

There shall be filed in connection with the entry a statement of the importer that the articles are to be used in remanufacture by melting.

■ Neither of the aforementioned letters of Arnold Ross, the pertinent portions of which were recited, supra, satisfies the requirements of section 54.6(a) that a statement be filed that the articles are to be used in remanufacture by melting.

■ Section 54.6(c) requires that—

Within 3 years from the date of entry * * * the importer shall submit to the collector of customs at the port of entry a statement of the superintendent or manager of the plant at which the articles were used in remanufacture by melting, showing: (1) the name and location of the plant; (2) the entry number, date, and port of entry * * *; (3) the date or inclusive dates of the processing of the articles; and (4) a description of the processing in sufficient detail to enable the collector to determine whether such processing constituted a use in remanufacture by melting. * * *

We have referred to the two affidavits executed by Knudsen which were forwarded by the collector. One states that, on October 14, 1960, the involved merchandise "was processed in our plant * * * by placing the metal pieces in our furnaces and reducing such metal to a molten state as the first step in its remanufacture." The second affidavit states that the bismuth was processed "by placing the metal pieces in our furnaces and reducing such metal to a molten state; the various element metals separated one from the other and cast into bar form for resale."

The description of the processing furnished in these affidavits is hardly calculated to meet the requirement of submission of proof that the merchandise had been used in *"remanufacture by melting."* Our appellate court, in the *United Metal* case, *supra,* made the following comment anent "remanufacturing" of articles under section 2:

* * * A material to be remanufactured must necessarily have previously been manufactured. As used in this section an article which is to be remanufactured does not encompass intermediate forms assumed during processes of manufacture, but rather embraces articles manufactured for a particular end use and subsequently imported into this country to be melted and remanufactured into other articles. * * *

The scant record herein does not support plaintiff's contention that the bismuth at bar, which had been melted down and cast into ingots of "homogeneous metal" in the country of exportation, comes within the purview of articles imported to be used in a remanufacturing, as distinguished from manufacturing, process.

For the foregoing reasons, plaintiff's claim for free entry under Public Law 869 cannot be sustained.

The protest is overruled and judgment will be entered accordingly.