UNITED STATES *v*. MORTON B. SMITH Co. (No. 1180).[1]

FREE LIST, PARAGRAPH 500, TARIFF ACT OF 1909.

Importers claimed, first, that old scrap iron imported from Cuba was entitled to admission free of duty as "articles the growth, produce, or manufacture of the United States;" and, second, that the scrap iron was a product of the soil or industry of Cuba and therefore entitled to a reduction of 20 per cent from the regular rate by virtue of the commercial convention with that country.

As to the first claim, *held* that it was incumbent on the importers to show not only that this scrap iron was goods the growth, produce, or manufacture of the United States, but to show as well in the manner prescribed by the Treasury regulations that they were the articles originally exported from this country, and, further, that they had not been advanced in value or improved in condition. They failed to do this and the goods were not entitled to free entry.

As to the second claim, *held* that there was no evidence in the record showing that the merchandise was a product of the soil or industry of Cuba.

United States Court of Customs Appeals, November 18, 1913.

APPEAL from Board of United States General Appraisers, Abstract 31854 (T. D. 33304).

[Reversed.]

*William L. Wemple*, Assistant Attorney General (*Charles E. McNabb*, assistant attorney, of counsel; *William A. Robertson*, special attorney, on the brief), for the United States.

Submitted on record by appellee.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

In this case the collector of customs at the port of New York classified an importation from Santiago, Cuba, as "old scrap iron

[1] Reported in T. D. 33918 (25 Treas. Dec., 529).

fit only for remanufacture by melting," and assessed it for duty at $1 per ton under the provisions of paragraph 118 of the tariff act of 1909, which paragraph is as follows:

118. Iron in pigs, iron kentledge, spiegeleisen, and ferro-manganese, two dollars and fifty cents per ton; wrought and cast scrap iron, and scrap steel, one dollar per ton; but nothing shall be deemed scrap iron or scrap steel except waste or refuse iron or steel fit only to be remanufactured by melting, and excluding pig iron in all forms.

The importer protested, first, that the goods were entitled to admission free of duty under paragraph 500 of the tariff act of 1909 as " articles the growth, produce, or manufacture of the United States," and, second, that if dutiable as scrap iron the merchandise, under Article II of the commercial convention with Cuba, was entitled, as a' product of the industry of Cuba to a reduction of 20 per cent from· the regular rate imposed by the paragraph under which the importation was assessed for duty.

Paragraph 500 of the tariff act of 1909, in so far as it is pertinent, · and Article II of the convention with Cuba, upon which the importer relies, are as follows:

Free list—500. Articles the growth, produce, or manufacture of the United States, * * * when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means; * * * but proof of the identity of such articles shall · be made, under general regulations to be prescribed by the Secretary of the Treasury, * * *.

Convention—Article II. During the term of this convention all articles of merchandise not included in the foregoing Article I and being the product of the soil or industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of twenty per centum of the rates of duty thereon as provided by the tariff act of the United States approved July 24, 1897, or as may be provided by any tariff law of the United States subsequently enacted.

The Board of General Appraisers found that the merchandise was imported from Cuba, and therefore sustained the protest. The Government appealed.

So far as the printed record and the papers filed with it disclose, the importing company made no effort whatever to establish its claim that the goods imported were the product of the industry of the Republic of Cuba. In fact, such evidence as the record contains tends to prove, if it has any probative value at all, that the scrap iron was a product of American rather than of Cuban industry.

Chester E. Abbott, the seller of the merchandise and the person who shipped it from Santiago, Cuba, made formal declaration on the . back of the invoice that—

This shipment of iron is of American manufacture, the first lot, 48½ tons, having a guaranty to that effect by Cuba Railroad Co., of Camaguey, Cuba.

The second lot, 35 tons, am unable to give documental proof, but customs receipts show entrance of American wrought-iron entry.

This declaration was fortified by a certificate from W. E. Knight, superintendent of motive power and shops of the Cuba Railroad Co., which certificate stated positively that—

All old iron sold to Mr. Chester E. Abbott by this company was originally manufactured and purchased in the United States of America and imported into Cuba from that country.

These two documents constitute the only evidence which we can find in the record tending to show in what country the goods originated or by what soil or industry they were produced, and certainly neither of them would justify a finding that the importation was of the character covered by Article II of our convention with Cuba. It does appear that the scrap iron was imported from Cuba, but that fact raises no presumption that it was a product of the soil or of the industry of Cuba, and, if it did, its weight as evidence would be more than counterbalanced by the certificate of the railroad company, which asserts that the merchandise was originally manufactured and purchased in the United States and from there imported into Cuba.

The fact that the old iron was sold by a railroad company in Cuba to the shipper is no evidence that it was used by the railroad company or that it came into Cuba in any form other than that in which it was last imported into the United States, and much less that it was the product of any industry of Cuba. As there is no evidence showing that the merchandise was brought to the condition in which it was imported by any industry of Cuba, it is unnecessary to decide whether iron manufactured in the United States and subsequently reduced to scrap iron in Cuba by reason of its use in the industries of that island can be considered as a product of such industries.

To sustain the importers' first ground of protest it was incumbent on it under the provisions of paragraph 500 not only to establish that the goods were the growth, produce, or manufacture of the United States, but also to show in the manner prescribed by the Treasury regulations that they were the articles originally exported from the United States and that they had not been advanced in value or improved in condition while abroad. Paragraph 500, Treasury regulations, articles 570, 571, 572, 573.

That obligation the importer failed to meet, and consequently its claim that the merchandise was entitled to admission free of duty as the growth, produce, or manufacture of the United States can not be sustained.

The conclusion reached by the Board of General Appraisers was not sustained by the evidence, in our opinion, and its decision is therefore *reversed*.